UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                                           :

JOSEPH CHRZANOWSKI                 :                    3:19 CV 1075 (RMS)
                                                             :
V.                                                         :
                                                             :
ANDREW SAUL, COMMISSIONER      :
OF SOCIAL SECURITY                 :                   DATE: JUNE  23, 2020
                                                             :
------------------------------------------------------ x

**RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, OR IN THE ALTERNATIVE, FOR REMAND FOR A HEARING, AND
ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF
THE COMMISSIONER**

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ("SSA") denying the plaintiff

disability insurance benefits ("SSDI") and Supplemental Security Income benefits ("SSI").

I.     ADMINISTRATIVE PROCEEDINGS

The claimant, Melissa Chzranowski,[1] filed an application for SSDI on August 26, 2016

and an application for SSI on January 26, 2016, claiming in both that she had been disabled since

March 11, 2015, due to bipolar disorder, attention deficit-hyperactivity disorder ("ADHD"),

anxiety disorder, degenerative disc disease, and post-traumatic stress disorder ("PTSD").  (Doc.

No 20, Certified Transcript of Administrative Proceedings, dated September 11, 2019 ["Tr."] 70,

235-51). The plaintiff's applications were denied initially and upon reconsideration (Tr. 124-25,

---

[1] The claimant in this case, Melissa Chzranowski, passed away on July 11, 2019. This case is an appeal of a denial of
Social Security benefits.  The Social Security Act "expressly provides for [a claimant's] Social Security benefits to be
paid to [the claimant's] survivors in the event [the claimant] dies before collecting [his/her] underpayments."  *Perlow
v. Comm'r of Soc. Sec.*, No. 10-CV-1661 SLT, 2010 WL 4699871, at \*1 (E.D.N.Y. Nov. 10, 2020) (citing 42 U.S.C.
§ 404(d)). Melissa Chrzanowski's claim, therefore, survives her death; this action is brought by her widower, Joseph
Chrzanowski.  (Doc. Nos. 9, 13-14, 17-19).

132-50, 155-71), and on April 16, 2018, a hearing was held before Administrative Law Judge ["ALJ"] Louis Bonsangue, at which the plaintiff and Beth Crane, a vocational expert, testified. (Tr. 28-69). On July 3, 2019, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 7-27). On August 28, 2019, the plaintiff requested review from the Appeals Council, and on May 17, 2019, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On July 10, 2019, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on July 22, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 7). This case was transferred accordingly. On November 17, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Hearing (Doc. No. 23), with a Statement of Material Facts (Doc. 23-2), and a brief in support. (Doc. 23-1 ["Pl.'s Mem."]).  On July 21, 2019, the defendant filed his Motion to Affirm (Doc. No. 25), with a brief in support (Doc. No. 25-1 ["Def.'s Mem."]), and his Statement of Material Facts. (Doc. No. 25-2).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand (Doc. No. 23) is GRANTED, and the defendant's Motion to Affirm (Doc. No. 25) is DENIED.

II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective Statement of Facts. (Doc. Nos. 23-2, 25-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

A.      RECORDS FROM BEFORE THE ONSET DATE OF DISABILITY

The claimant's medical records begin more than five years prior to her alleged onset date of disability; her treatment records reflect a history of chronic back pain, and regular visits to the emergency department. On February 8, 2010, the claimant was seen at the emergency department for chronic back pain that radiated to her right leg with paresthesias.  (Tr. 1137). She was given Oxycodone.  (Tr. 1138).  Four months later, on June 24, 2010, she underwent an MRI of her lumbar spine which showed "[m]ild degenerative disease [in the] lower lumbar spine without significant interval change." (Tr. 618, 1121).

She returned to the emergency department on August 4, 2010, with complaints of right anterior ankle and foot pain that had been gradual and progressive after she did a lot of walking. (Tr. 1147-50). She was given Naprosyn.  (Tr. 1150). On September 14, 2010, the claimant presented to the hospital with ankle pain that had been progressively worsening with swelling; there was no fracture on prior x-rays. (Tr. 1163; *see* Tr. 1122-23). She was discharged home in a wheelchair (Tr. 1164), and she was given Percocet and Oxycodone, as well as acetaminophen and ibuprofen. (Tr. 1167).

On November 15, 2010, the claimant presented to the emergency department with back pain and upper leg pain. (Tr. 1172). She fell while cleaning her bathtub.  (Tr. 1176). Her history of degenerative disc disease of the lumbar spine for which she had injections was noted. (*Id.*). She had chronic pain, worse in the right lower lumbar area radiating through her right leg. (Tr. 1176). She was given Robaxin, Percocet and ibuprofen (*id.*), and discharged with Vicodin and Robaxin. (Tr. 1183).

On January 18, 2011, she returned to the emergency department with lower leg pain after she fell on the stairs. (Tr. 1190).  X-rays were negative for fracture. (Tr. 1195). She was given

Percocet and acetaminophen.  (Tr. 1196).

Just over a week later, she returned with complaints of pain in her left ankle.  (Tr. 1206-08).  She was given Vicodin and Voltaren.  (Tr. 1208, 1212).

On February 4, 2011, the claimant went to the emergency department for complaints of sudden onset left lateral ankle pain that started when she was walking. (Tr. 715, 1218). An x-ray of her ankle was negative. (Tr. 1222). She was given Vicodin.  (Tr. 718, 1221).

On March 28, 2012, the claimant presented to Rockville Family Physicians with a request for Hydroxyzine for her anxiety and Gabapentin for her back pain. (Tr. 374). She returned to the emergency department on April 12, 2012 with complaints of back pain after slipping on the stairs while carrying laundry. (Tr. 427, 726; *see* Tr. 723). She had normal range of motion. (Tr. 428, 726). She was assessed with a lumbar strain and a muscle spasm and discharged with Flexeril. (Tr. 429, 727).

On June 1, 2012, the claimant was seen at the emergency department for low back pain; she had normal range of motion and was non-tender to palpation.  (Tr. 423-25, 738-41). She was discharged with a prescription for Tylenol with codeine. (Tr. 425, 741).

On June 8, 2012, the claimant returned to Rockville Family Physicians with hand pain. (Tr. 372).  She reported that following a car accident two years ago, she felt pain on and off in her left hand and arm. (*Id.*). Upon neurological examination, mild hand tremors were noted. (Tr. 373).

On June 13, 2012, she returned to the emergency department "with bad menstrual cramping."  (Tr. 419-21).  She was given Percocet, Oxycodone and Acetaminophen.  (Tr. 421).

On June 25, 2012, the claimant underwent a psychiatric evaluation with Miriam Haynes, APRN at Community Health Resources, for treatment of her depression.  (Tr. 432-34). She reported that, a few years prior, she was diagnosed with bipolar disorder and ADHD and was doing

well at home until her stepson moved in with them, which caused problems with her marriage. (Tr. 432). Therapy helped her to cope with her anger. (*Id.*). She abused Oxycontin which she was prescribed for her degenerative disc disease. (*Id.*). She went through detoxification at Stonington Institute; she smoked marijuana every day and occasionally drank beer. (*Id.*). She reported a history of abuse as a child, and abuse from her ex-boyfriend; she had nightmares of those incidents. (*Id.*). The claimant was well groomed but somewhat restless, and her speech was "somewhat delayed, slurred, rapid, loud, and excessive." (Tr. 433). Her mood was angry, irritable, and anxious, and she was sad and depressed. (*Id.*). She had a "labile" affect, and "circumstantial" thought process. (*Id.*). She appeared anxious, irritable, and angry, and had trouble sleeping. (*Id.*). She smoked marijuana to calm herself. (*Id.*). She was assessed with anxiety disorder, borderline intellectual functioning, rule out ADHD, and rule out bipolar disorder. (*Id.*).

On July 16, 2012, the claimant was seen at the emergency department for back pain after lifting and attempting to carry a large laundry basket upstairs. (Tr. 415, 755). She was told to follow up with her physician and was given Percocet, Oxycodone, Acetaminophen, and Robaxin. (Tr. 417-18, 755-56).

The claimant was seen on August 2, August 6, and August 14, 2012, with complaints of pain from endometriosis. (Tr. 402-10). An abdominal CT scan showed a 2.5 centimeter right ovarian cyst and a small to moderate amount of free pelvic fluid. (Tr. 411, 414). She was in "no apparent distress; sitting comfortably on [the] stretcher reading [a] magazine." (Tr. 403). She requested Percocet, but her chart advised not to give her pain medication as she recently had received twenty Vicodin from a different provider. (Tr. 404, 406). On August 6, she was discharged with Percocet, Oxycodone, acetaminophen and Naprosyn. (Tr. 412).

On August 17, 2012, she was seen at Rockville Family Physicians with back pain that was

constant, stabbing and shooting, and located in the lumbosacral area, with radiation to the middle back. (Tr. 368). Her symptoms were aggravated by lying down for long periods and relieved by prescribed opioids and sometimes Cymbalta. (*Id.*). A month later, she returned with the same complaints; she was given Percocet.  (*Id.*).

Records from Rockville Family Physicians on October 4, 2012 reveal that the claimant exhibited drug seeking behavior and that she was not taking her prescribed Cymbalta. (Tr. 366-67). Upon her exit, there was "no sign of any back pain with brisk and determined steps and gait without any hesitation of limping."  (Tr. 367).

On October 9, 2012, Dr. Mark Spencer from Woodland Anesthesiology pain management department declined to care for the claimant after reviewing her records; he did not "feel there [was] any procedure [he] could offer that [would] benefit" the claimant. (Tr. 378).

On October 29, 2012, she returned to the emergency department with complaints of back pain that radiated down her right side into her buttock and posterior leg.  (Tr. 399-400, 767-68). She was given Vicodin, Flexeril and ibuprofen. (*Id.*).

On November 19, 2012, the claimant presented to the emergency room with chronic back pain and complaints of right lower back pain for the past three days.  (Tr. 392, 786). She was assessed with low back pain and discharged with Flexeril. (Tr. 394*,* 787).

On November 29, 2012, the claimant went to the emergency room with complaints of dental pain, for which she was given Vicodin. (Tr. 388-91).

On December 3, 2012, the claimant was seen at Rockville Family Physicians for a lower extremity injury after a fall. (Tr. 364). The next day, she was discharged from their care due to a "conflict."  (Tr. 377).

On December 10, 2012, the claimant reported that she was in a dark place and was "having

substance abuse problems again." (Tr. 362-63). She acknowledged "inappropriately" taking her psychiatric medications, having dizzy spells, and injuring her lower extremity during a fall. (Tr. 362).

On January 8, 2013, the claimant presented to the emergency department with knee pain. (Tr. 798-99). She was given Tylenol with codeine. (Tr. 801).

On March 20, 2013, she returned to the emergency room after sustaining a fall that she said made her virtually unable to walk. (Tr. 812). X-rays were negative; she had a contusion on her right hip. (Tr. 816). She was given Dilaudid, Toradol and Percocet. (Tr. 815).

On May 22, 2013, the claimant underwent x-rays of her lumbar spine, sacrum and coccyx; the results were "[n]ormal." (Tr. 1124-25). The MRI of her lumbar spine showed early degeneration at L5-S1 and T11-T12 with some bulging of the disc noted. (Tr. 617, 670, 1126).

On June 5, 2013, the claimant presented to the emergency room with left knee pain. (Tr. 828). She stated that, if she had her knee bent for a while, it would hurt when she straightened her leg. She reported that she had soreness in the back and the sides of her knee. (Tr. 831). She left the hospital before a knee x-ray could be performed (*Id.*).

On August 27, 2013, the claimant went to the emergency department after her car was struck by another vehicle pulling out of a parking lot. (Tr. 837). Her head snapped back. (*Id.*). She had neck pain, and her chronic low back pain was "worse than usual." (Tr. 841). An x-ray of her neck was negative. (Tr. 842).

On September 15, 2013, she returned to the emergency department with complaints of ankle pain. (Tr. 865). An x-ray was negative; her pain was not helped by elevation, ice, or over-the-counter pain medication. (Tr. 868).

Three months later, on December 24, 2013, the claimant was seen at the emergency

department for arm pain; she had gotten into an altercation with her husband, and he had pushed her hard causing her arm pain. (Tr. 889).  She reported that she felt safe with her husband and did not want to press charges. (Tr. 893). X-rays were negative.  (Tr. 894).  She was given Vicodin. (Tr. 895).

A week later, on December 30, 2013, she returned to the emergency department complaining of left elbow pain.  (Tr. 914).  When she was seen six days prior, she had been told to follow up with an orthopedist, but she had not done so.  (Tr. 916).  She was given another prescription for Vicodin.  (Tr. 924).

She was seen again in the emergency room on February 17, 2014, after she slipped and fell on ice.  (Tr. 960).  She claimed back pain, but she had no tenderness on exam and no back spasms.  (Tr. 963).  She was assessed with psychogenic pain.  (*Id.*).

On February 22, 2014, she presented to the emergency department with complaints of chest pain.  (Tr. 980). She reported pain in her interior right lower lateral chest wall that radiated to her right mid back, and was worse with any movement, with deep breaths, and to the touch. (Tr. 980).  A CT scan of her chest showed "[n]o gross evidence [of] pulmonary embolus" but "[s]table tiny bilateral nodules consistent with a benign process." (Tr. 986).

On April 15, 2014, the claimant presented to First Choice Health Centers to establish care for severe back pain.  (Tr. 705).  On physical examination, her back was tender to palpitation over the lumbosacral area with bilateral muscle spasm. (*Id.*).

On June 22, 2014, APRN Elyse Doherty noted, "I do not believe that [the claimant] has evidence of ADHD at this time." (Tr. 435).

On August 21, 2014, the claimant went to the emergency department after slipping on the kitchen floor and hurting her elbow.  (Tr. 1006). An x-ray revealed no fracture.  (Tr. 1010).  She

requested Vicodin but was told to take Tylenol or ibuprofen.  (Tr. 1012).

On August 25, 2014, the claimant underwent an x-ray of her cervical spine which showed altered curvature and mild degenerative changes.  (Tr. 1128). An x-ray of her left shoulder, taken the same day, showed minimal "AC joint spurring. Otherwise unremarkable exam."  (Tr. 1129). An x-ray of her lumbar spine, taken on September 16, 2014, showed no acute fracture, and no evidence of spondylolisthesis. (Tr. 1130).

On September 19, 2014, the claimant underwent an evaluation for physical therapy of her left arm. (Tr. 1105). She described her pain as between a six and ten, with constant throbbing. (Tr. 1105). She had hand weakness, and tenderness on examination, and her pain affected her ability to grip.  (Tr. 1106-07). On November 14, 2014, the claimant was discharged from physical therapy due to her poor attendance and noncompliance. (Tr. 1111).

On January 8, 2015, the claimant presented with traumatic right knee pain; she fell on concrete four or five days prior. (Tr. 801). She was taking ibuprofen with slight relief *(Id.).* She was discharged home with a prescription for Tylenol Three. (Tr. 802).

On January 22, 2015, the claimant underwent an intake for physical therapy for her chronic low back pain.  (Tr. 1112-15).  She had difficulty with all activities of daily living, increased pain with cold weather, pain going from sitting to standing, and a history of falls. (Tr. 1112). She was assessed with chronic low back pain, pain with increased activity, decreased range of motion, decreased strength, and decreased functional mobility. (Tr. 1114).  After the initial intake, the claimant did not schedule any physical therapy sessions. (Tr. 1118).

On February 5, 2015, the claimant was seen at the emergency department for a cut on her finger.  (Tr. 1031).  She was given Motrin and Keflex.  (Tr. 1032).

On February 19, 2015, the claimant presented for a crisis evaluation at First Choice Health

Centers.  (Tr. 436-38).  She was angry and irritable.  (Tr. 436).  APRN Doherty opined that the claimant "likely" had bipolar II disorder and ADHD; she prescribed an increase in Seroquel and added clonazepam.  (Tr. 438).

On February 26, 2015, APRN Doherty opined again that she did "not believe [the claimant had] evidence of ADHD[.]" (Tr. 440).  The claimant continued to have mood irritability and was verbally aggressive and violent with her husband and stepson. (Tr. 441). She had mildly impaired insight and judgment and seemed to have difficulty understanding the medications she needed to take. (*Id.*). It was unknown if this was because of limited intelligence or medication side effects. (*Id.*).

### B.   RECORDS FROM AFTER THE ONSET DATE OF DISABILITY

On March 11, 2015, the claimant was seen by APRN Doherty for a psychotropic medication evaluation.  (Tr. 445).  She was going to cosmetology school.  (*Id.*).  Her bipolar II disorder was in "early remission with . . . Depakote, clonazepam."  (Tr. 446).

On May 13, 2015, she complained of anxiety after her clonazepam was reduced.  (Tr. 448). She relapsed on heroin but did not plan to use it again. (*Id.*). Her mood was constricted, her affect was anxious and mildly dysphoric, her memory was intact, and her concentration was improved after she stopped "reading or texting in the beginning of [the] interview."  (*Id.*).

On April 16, 2015, the claimant presented to physician assistant ["PA"] Stephanie Behrens at First Choice Health Centers, with complaints of back pain.  (Tr. 501, 556, 702).  She had full range of motion but reported sharp shooting pain when she walked.  (*Id.*).  She had sacroiliac joint tenderness.  (Tr. 502, 557, 703).  She was given Medrol and Tramadol.  (*Id.*).

She was seen on June 22, July 22 and July 31, 2015 for complaints of back pain.  (Tr. 496, 499, 697, 700). She was taking Gabapentin, which "help[ed]."  (*Id.*). On July 14, 2015, the

claimant underwent an MRI of her lumbar spine that showed "[n]o evidence of spinal canal stenosis, neuralforaminal narrowing or evidence of herniated nucleus pulposus[.]" (Tr. 504, 712, 1131).

On August 27, 2015, the claimant saw PA Behrens for stomach issues; she had nausea, reflux, and difficulty digesting food.  (Tr. 695).  On October 12, 2015, she was seen for sleeping issues; she requested a refill of Seroquel. (Tr. 491, 692). On December 29, 2015, the claimant was seen for bipolar disorder; she was taking Gabapentin and Seroquel. (Tr. 485, 686).

On March 4, 2016, the claimant was seen for a follow up drug screen; she reported insomnia but said she was otherwise feeling okay.  (Tr. 482-83, 683-84). On March 30, 2016, the claimant presented to the emergency department with elbow pain, from an old injury.  (Tr. 611, 1047). She was diagnosed with lateral epicondylitis, given Vicodin, and discharged home with instructions to follow up with her provider. (Tr. 611-15, 1047-52).

On May 18, 2016, the claimant reported to PA Behrens that she suffered from insomnia since starting antiviral medication for hepatitis C. (Tr. 479, 680).  She requested an increase in Seroquel to sleep. (*Id.*).

On July 21, 2016, the claimant was seen at the emergency department complaining of lingering shoulder pain from an injury three years prior.  (Tr. 604, 1066).  She was given ibuprofen and Robaxin, which, like the Flexeril she was taking, caused sedation. (Tr. 607, 609).

On July 26, 2016, the claimant was seen by a social worker for anxiety with panic and obsessive-compulsive disorder. (Tr. 471-72, 672-73). She had mild depression and symptoms of anxiety, panic, obsessive compulsions, insomnia, ADHD, and addiction. (Tr. 471, 672). She had a history of anger management with inappropriate anger and aggressive behaviors, anxiety with support, phobia including excessive worry, low energy, panic attacks, restlessness, depression,

isolative behaviors, increased sleep, inability to function, feelings of worthlessness and feeling slowed down, difficulty sleeping, decreased concentration, and obsessive thoughts  accompanied by compulsive behaviors and rituals, including cleaning, folding towels, and washing dishes, which caused marked distress and interfered with her activities of daily living. (Tr. 471-72, 672-73).  She met the criteria for multiple substance use disorders in remission and cannabis use disorder, and she met the preliminary criteria for bipolar disorder II, in partial remission.  (Tr. 472, 672).

On June 30, 2016, the claimant presented with insomnia and bipolar disorder. (Tr. 678). At that time, she did not see a psychiatrist; she was told one would be assigned.  (Tr. 679). PA Behrens noted that she needed to "figure out what [was] going on with [S]eroquel [prescription], per pharmacy [three] different providers at [three] different doses." (*Id.*).

The claimant was seen at the emergency department on July 21, 2016 for arm pain.  (Tr. 1062).  She was given ibuprofen and Robaxin. (Tr. 1067).  Five days later, on July 26, 2016, she was seen by a licensed clinical social worker for a behavioral intake; she complained of anxiety with panic. (Tr. 672).  She had aggressive behaviors with "inappropriate anger[,]" anxiety with agoraphobia, excessive worry, low energy with panic attacks, restlessness, depression, feelings of worthlessness, decreased energy, and decreased concentration.  (Tr. 673).  She reported substance abuse of heroin, opiates, benzodiazepines, and alcohol, for which she was in "[e]arly partial remission." (Tr. 675).  She was assessed with bipolar II disorder, "preliminary, in partial remission[,]" and cannabis dependence.  (Tr. 676).

On August 5, 2016, the claimant reported that her mood was up and down, her focus and concentration were very poor, and she had "great difficulty" completing tasks. (Tr. 469, 670). She reported heightened anxiety and racing thoughts all the time. (*Id.*).

12

On September 9, 2016, she was seen for medication management; her mood was "all over the place[,]" and she presented as extremely irritable and blaming others for her own issues. (Tr. 467, 668).  She took methadone, and she did not feel that her Seroquel and clonidine were at adequate doses. (*Id.*).

On October 19, 2016, the claimant reported back pain and that she was trying to lose weight. (Tr. 464, 665). She was assessed with bipolar disorder, anxiety, heroin addiction, degenerative disc disease of the lumbar spine, and acute vomiting. (Tr. 465, 666).

On November 8, 2016, Dr. Charles Vassilopoulos, Ph.D., performed a consultative examination of the claimant in connection with her application for benefits.  (Tr. 517-21). Her rate of speech was in the full range, and her mood and affect were depressed. (Tr. 517). Her responses indicated a significant number of vegetative symptoms. (Tr. 520).  Her orientation was in the moderately impaired range, and her insight was poor. (Tr. 520-21). The examiner could not determine her ability to perform commands or instructions; she dozed off "with literally every question" because she woke up at two in the morning to "collate newspapers and assist her husband."  (Tr. 517).  Her judgment was very poor, and her responsibility to perform employment was questionable. (Tr. 521).  The claimant reported that she had "freak out" episodes with people and had an "attitude," but when asked if she had difficulty maintaining employment, she said she wanted to work in a bank as a teller.  (Tr. 519).  She cared for her husband's children during the day, grocery shopped, independently "performed self-care skills[,]" and attempted to do household chores.  (*Id.*).

On November 15, 2016, the claimant reported to her social worker that she had difficulty functioning. (Tr. 662). She was unkempt, overmedicated with slurred and lethargic speech and had delusions.  (Tr. 663). She was oriented with poor insight and judgment. (Tr. 663).

On November 19, 2016, the claimant underwent a consultative examination with Dr. Anthony Roselli. (Tr. 531). Based on the physical examination, Dr. Roselli found "no palpable tenderness or spasms" in the claimant's spine, though he noted that she could not "fully flex." *(Id.).* He opined that she could walk/stand for two hours in an eight-hour day, could sit for four hours in an eight-hour day, would have difficulty crawling, and could not stand or walk for prolonged periods. (Tr. 536). She did not require an assistive device, and her maximum lifting and carrying capacity was ten pounds frequently and twenty pounds occasionally. (*Id.*). She had degenerative disc disease in her lumbosacral spine with radiculopathy going down her right leg. (*Id.*). She had bipolar disorder and posttraumatic stress disorder which was unmedicated. (*Id.*).

On November 22, 2016, Kenneth Bangs, Ph.D., completed a Psychiatric Review Technique of the claimant in connection with her application for benefits. (Tr. 78). He concluded that her allegations were not supported. (*Id.*). Similarly, on December 15, 2016, State agency reviewer, Dr. Keith Kaplan, opined that the claimant's primary allegation, degenerative disc disease, was not supported by the medical evidence in the record, and her endometriosis, ovarian cyst, and hepatitis C were non-severe impairments. (Tr. 77; *see* Tr. 88-89).

PA Behrens referred the claimant to Connecticut GI, where she was seen by APRN Jenna Cooke. (Tr. 708-09). She assessed the claimant's hepatitis C and recommended an endoscopy and abdominal ultrasound for her claim that she was vomiting undigested food. (Tr. 709).

On January 30, 2017, the claimant presented to the emergency department with ankle pain. (Tr. 1205). She had been walking more and noticed a throbbing pain that was made worse with range of motion and palpitation at the lateral left ankle as well as to the posterior Achilles. (Tr. 1208).

On February 24, 2017, the claimant had an esophagastroduodenoscopy which revealed

esophagitis, a sliding hiatal hernia, and erosive gastritis in the stomach. (Tr. 619-20). On February 27, 2017, State agency reviewer Dr. Myron Watkins offered the same opinion as Dr. Kaplan, noting that there was no new medical evidence of record. (Tr. 102).

On March 3, 2017, the claimant reported depression, low motivation, energy, crying spells, irritability, and weight gain. (Tr. 660). She had "very poor" attention and concentration, she was irritable and quick to respond, and she wanted to get off methadone. (*Id*).

On March 25, 2017, Dr. Vassilopoulos performed a second consultative examination of the claimant. (Tr. 539-44). She appeared fatigued and was difficult to understand. (Tr. 539). Her immediate and delayed memory were severely impaired, and her memory retrieval was mildly impaired. (Tr. 542). Her memory for contextual information was severely to moderately impaired and her memory for instruction was in the low average range (*Id.*). Her construction was moderately impaired, and she was not able to provide interpretation of two proverbs. (*Id.*). Her similarities and differences reasoning were in the severely impaired range, and her judgment was moderately impaired. (*Id.*). Her insight was poor. (Tr. 543). She reported that she watched television, used the computer, cleaned, grocery shopped, cooked, performed household chores, and packaged and delivered newspapers daily. (Tr. 541). She showed symptoms of ADHD, and she described aggressive ideations. (Tr. 544). She was assessed with bipolar disorder and ADHD. (*Id.*). She could perform simple commands but had difficulty comprehending and performing instructions. (*Id.*).

On March 28, 2017, the claimant reported to PA Behrens that she had hearing deficits greater on the right side. (Tr. 657). She also reported having to use food banks to get food. (*Id.*). The next day, she was seen for her first session with Licensed Clinical Social Worker Courtney McBurney; she had requested a female therapist. (Tr. 654). She was visibly restless with "flight

of ideas." (*Id.*). She was focused on discussing her new candle business and she tried to sell candles in McBurney's office.  (*Id.*).

On April 5, 2017, Jerrold Goldman, Ph.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of the claimant in connection with her application for benefits.  (Tr. 102-06, 116-20).  He concluded that the claimant was moderately limited in her ability to understand, remember and carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. 105, 117).  She could remember simple instructions and procedures but would have difficulty remembering more complex instructions and procedures. (*Id.*). He noted that she prepared meals, did laundry, cleaned, drove, shopped, and handled her own finances.  (Tr. 103).  She was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; she was likewise moderately limited in her ability to perform at a consistent pace without an unreasonable number or length of rest periods. (Tr. 106, 120).

On April 10, 2017, the claimant was the driver in a multi-vehicle crash; she swerved and crossed the yellow line.  (Tr. 1078-81; *see* Tr. 582-603).  She was transported to the emergency department with a laceration on her forehead from the airbag.  (*Id.*).  She was lethargic; the accident occurred on her way from the methadone clinic.  (*Id.*). She responded to Narcan and was discharged.  (Tr. 591). A CT scan of her head and cervical spine showed a "[p]ossible 4 mm dural calcification [or a] meningioma in the right middle cranial fossa." (Tr.  602, 1086).

On April 14, 2017, she returned to First Choice Health Centers where she reported that she had been in a car accident; she had an acute intractable headache and concussion with loss of consciousness. (Tr. 652-53).

A week later, the claimant saw PA Behrens for a headache and pain in her upper neck and

into the forehead from her car accident. (Tr. 649). She was assessed with post-concussive syndrome and a laceration of her forehead. (Tr. 650).

On April 27, 2017, she reported to her social worker, McBurney, that she had "higher stress" from her recent accident.  (Tr. 647).  Individual counseling was recommended.  (*Id.*).  The next day, she was seen for medication management.  (Tr. 645).  She reported that she was not taking her methadone consistently, and that it caused sedation.  (*Id.*). Latuda helped her mood, and clonidine made her "feel weird."  (*Id.*).

On May 23, 2017, she reported to McBurney that her Seroquel made her sleepy and that she wanted to go home and take a nap. (Tr 643). She wanted to find a job so that she could increase her independence. (*Id.*).  She committed to completing one or two job applications in the next two weeks. (*Id*).  The next day, she was assessed with post-concussion syndrome; she still had headaches from her car accident. (Tr. 641). On June 5, 2017, she was assessed with hypermetropia of both eyes. (Tr. 638-39).

On June 6, 2017, the claimant was seen by a licensed clinical social worker who noted that the claimant was tired because she woke up early in the morning to help her husband with paper delivery.  (Tr. 636).  She had a difficult time sustaining her attention and was often forgetting what she was talking about and falling asleep while talking. (*Id.*). She also reported that she took Seroquel that morning and that it made her sleepy, but it was better than taking pills she "shouldn't be" taking. (*Id.*) The session ended early because the claimant kept falling asleep. (*Id.*).

The claimant returned on June 22, 2017.  (Tr. 634).  She had an improved mood, and she decided to take her medication after her appointments rather than before so that she would not be drowsy.  (*Id.*). She reported increased motivation to complete tasks if she got them done in the morning rather than in the afternoon when she knew that she would be napping. (*Id.*).

On July 14, 2017, the claimant reported to her social worker that she was in a positive mood and that she got another job with her husband picking up garbage in grocery store parking lots. (Tr. 632). She was also doing some direct sales "to increase independence and [was] meeting with her mentor to improve her sales techniques." (*Id.*). She had improved concentration and required minimal redirection, and she reported working with her doctor to reduce her methadone. (*Id.*).

She was seen for medication management on July 28, 2017. (Tr. 630). She stopped taking Latuda, and she requested a higher dose of Seroquel for sleep. (*Id.*). She reported that she lost her ability to have "take home bottles of methadone" because she was not taking the doses correctly. (*Id.*). Her mood and behavior were labile and she was forgetful. (*Id.*).

On August 2, 2017, she complained of left knee pain; she had fallen over a rock and broken her right toe days earlier. (Tr. 627-28). She was assessed with a closed, non-displaced fracture of the phalanx of the lesser toe of the right foot and "medication side effects." (Tr. 627).

On August 25, 2017, the claimant was seen for left knee pain. (Tr. 624-25). PA Behrens noted that the claimant was more alert since she stopped using Flexeril, but that she was requesting Flexeril because it helped with her shooting pain. (Tr. 624). She was assessed with nerve pain and "pes anserine bursitis." (Tr. 625).

On September 15, 2017, the claimant was transferred from her doctor's office to the emergency room after reporting constant pain, exhibiting drug seeking behavior and making suicidal statements. (Tr. 621; *see* Tr. 571-76). Her doctor refused to give her Flexeril because of its sedating effects. (Tr. 574, 621). She underwent an emergency psychiatric services evaluation; she reported that she argued with her husband daily, and she was angry, loud and initially uncooperative. (Tr. 579; *see* Tr. 580-81). At first, she threw things around the room because she

was upset that she was denied "certain med[ications]."  (Tr. 578).

On November 2, 2017, the claimant returned to the emergency department with complaints of dental pain; she was given Naprosyn and a prescription mouth wash.  (Tr. 562-67).

On February 22, 2018, the claimant had an ultrasound of her neck which revealed a "small sub centimeter right thyroid nodule" and a small cyst. (Tr. 718; *see* Tr. 711).  A scan taken on March 5, 2018 was a "[n]ormal thyroid scan and uptake." (Tr. 710).

### C.      CLAIMANT'S TESTIMONY

The claimant testified before the ALJ on April 16, 2018. (Tr. 28). On the date of the hearing, the claimant was thirty-nine years old, married and living in an apartment with her two stepsons, then-ages sixteen and twenty.  (Tr. 35).  She graduated from high school and worked for Stop and Shop, for Companions and Homemakers as a housecleaner for the elderly, and part-time for Dunkin' Donuts. (Tr. 38-39). She had not worked since 2015.  The ALJ noted that none of the claimant's work amounted to "past relevant work." (Tr. 39).

The claimant testified that, in 2008, she fell asleep behind the wheel, resulting in a car accident that left her unconscious.  (Tr. 40-41).  She testified that she had trouble remembering, and that she could not sit or stand for more than fifteen minutes at a time.  (Tr. 41, 47). She experienced pain in her lower back that traveled down her legs or up her back.  (Tr. 48). She could only walk for about five minutes before she had shooting pain in her back.  (Tr. 51).  Her husband helped her with laundry, but "other than that [she did] what [she could] handle." (Tr. 42). In her application for benefits, however, the claimant reported that she took "care of [her] husband, stepchildren . . . [and] pets. [She did the] cooking, laundry" and "tr[ied] to do what [she could do] to clean."  (Tr. 310).  She testified that she had good days and bad days, and that she took Gabapentin for her back which sometimes helped, and sometimes did not do "much of anything."

19

(Tr. 53-54).  She reported that she made some baked goods, and cooked, washed dishes, cleaned the litter box and cleaned the toilet, but that she had a lot of pain and discomfort.  (Tr. 313).

The claimant had seen a mental health provider about once a month, and, at the time of the hearing, she was not seeing anyone but was "making appointments to get things taken care of." (Tr. 43).  She testified that she had bipolar disorder, she had a history of using heroin, and, for the previous four years, she had been going to a clinic for methadone.  (Tr. 45-46).

The claimant explained that she had anger issues and, as a result, she did not have many friends, and she had problems "with handling people" when she was working. (Tr. 57-58). Additionally, she testified that she could not learn the job "quick enough" when she worked at Dunkin' Donuts.  (Tr. 60-61).

The vocational expert testified that a hypothetical individual limited to medium work, frequent ramps and stairs, occasional stooping, kneeling, crouch and crawling, and no ability to climb ladders, ropes or scaffolds, and performing only simple, routine, repetitive tasks, with no work directly with the public, could perform the work of a hand packager, laundry worker, and machine feeder.  (Tr. 63-64).  If such an individual was subject to the same limitations except that the individual could perform light work rather than medium work, such an individual could perform the work of a small parts assembler, electronics worker, and an inspector and hand packager. (Tr. 64). Such work would be precluded, however, if the individual had to shift positions either from sitting to a standing position or leave a work station altogether because he or she was off-task more than ten percent of the workday, such an individual would be precluded from performing all work. (Tr. 65).  Similarly, if a hypothetical individual could only sit for four hours a day and stand or walk two hours a day, that individual could not sustain full-time employment.  (Tr. 66).  Additionally, if this individual, on an occasional basis, was not able to

tolerate regular work pressure in such a way that the individual would have occasional aggressive or violent outbursts, that scenario would also preclude all work.  (Tr. 66).  And if such an individual had occasional off-task behavior because of poor focus and concentration, that person also could not perform work.  (Tr. 67-68).

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[2] the ALJ found that the claimant met the insured status requirements through December 31, 2018 (Tr. 12), and that the claimant did not engage in substantial gainful activity since her alleged onset date of March 11, 2015. (Tr. 13, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

At step two, the ALJ found that the claimant had the following severe impairments: attention deficit hyperactivity disorder, bipolar disorder, anxiety disorder, degenerative disc disease of the lumbar spine, and sacroiliitis. (Tr. 13, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

---

[2] First, the ALJ must determine whether the claimant is currently working.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a).  If the claimant is currently employed, the claim is denied.  *Id.*  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998).  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv).  If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

The ALJ concluded at step three that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1525, 404.1526, 416.920(d), 416.925 and 416.926, and specifically, did not meet or medically equal the criteria of listing 1.02 (Major Dysfunction of a Joint), or listing 1.04 (Compromise of the Nerve Root or Spinal Cord), and listing 12.04 regarding the claimant's mental impairments. (Tr. 13-15).

The ALJ concluded that the claimant had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that she could frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds; she could occasionally stoop, kneel, crouch and crawl; and, she could perform simple, routine, repetitive tasks with no work with the public.  (Tr. 15).

At step four, the ALJ concluded that the plaintiff had no past relevant work; however, at step five, the ALJ found that the claimant could perform other work in the national economy, including the work of a hand packager, laundry worker, and machine feeder. (Tr. 21-22, citing 20 C.F.R. §§ 404.1569, 404,1569(a) and 416.969(a)). Accordingly, the ALJ concluded that the claimant was not under a disability at any time from March 11, 2015, through the date of his decision. (Tr. 22, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

IV.   STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if

the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff argues that the ALJ omitted multiple factors from his RFC determination. (Pl.'s Mem. at 14-16). He claims that the ALJ erred in failing to incorporate the opinions of the State agency doctors to whom he assigned the greatest evidentiary weight (Pl.'s Mem. at 12-14) and minimized the opinions of the two consulting doctors who examined the claimant three different times. (Pl.'s Mem. at 8-12).

The defendant counters that the ALJ's physical RFC finding for a range of medium work was supported by substantial evidence found in the claimant's treatment records, her testimony

regarding her daily activities, and the opinions of the two State agency physicians. (Def.'s Mem. at 4-8). Additionally, the defendant argues that the ALJ's mental RFC finding was supported by substantial evidence found in the claimant's treatment records, which documented her failure to follow prescribed treatment and her engagement in activities that worsened her sedation; the ALJ also relied on the claimant's description of her daily activities and the opinions of the State agency psychologists. (Def.'s Mem. at 8-17).

### A.   THE ALJ ERRED IN HIS DISCUSSION OF THE CLAIMANT'S PHYSICAL RFC DETERMINATION

The RFC "is an assessment of 'the most [the disability claimant] can still do despite [his or her] limitations.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. § 404.1545(a)(1)). An RFC is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1). Thus, "[i]n some cases, an ALJ may make an RFC finding without treating source opinion evidence," "when the record is 'clear' and contains '*some* useful assessment of the claimant's limitations from a medical source.'" *Morales v. Colvin*, No. 3:16 CV 3 (WIG), 2017 WL 462626, at *3 (D. Conn. Feb. 3, 2017) (citing *Staggers v. Colvin*, No. 3:14 CV 717 (JCH), 2015 WL 4751123, at *3 (D. Conn. Aug. 11, 2015) (emphasis in original)) (additional citation omitted); *see also Newton v. Berryhill*, No. 3:18 CV 244 (MPS), 2019 WL 4686594, at *2 (D. Conn. Sept. 26, 2019).

As discussed above, the ALJ concluded that the claimant had the RFC to perform "medium work" as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c). As an initial matter, the ALJ referred to "medium work" but then, in the body of the decision, the ALJ repeated referenced the plaintiff's ability to perform "light work," as discussed below.[3] Additionally, at step five, the ALJ

---

[3] Light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), involves "lifting no more than [twenty] pounds at a time with frequently lifting or carrying of objects weighing up to [ten] pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involved sitting

concluded that the claimant was capable of performing the work of a hand packager, laundry worker, and machine feeder. (Tr. 21-22, citing 20 C.F.R. §§ 404.1569, 404,1569(a) and 416.969(a)).  The ALJ identified these jobs based on the testimony of the vocational expert who explained that an individual limited to "***medium work***" could perform the work of a hand packager, laundry worker, and machine feeder.  (Tr. 63-64 (emphasis added)).  If the ALJ's reference to "medium work" in the RFC determination was merely a scrivener's error, given the references to "light work" in the body of his decision, the jobs identified at step five presumably would correlate with the vocational expert's testimony regarding a hypothetical individual limited to "light work[.]"  The vocational expert, however, testified that a hypothetical individual limited to "light work" could perform the work of a small parts assembler, electronics worker, and an inspector and hand packager, none of which the ALJ identified in his step five finding. (Tr. 64). Instead, the ALJ concluded that the claimant was capable of performing the jobs identified by the vocational expert as "medium work."   The Court cannot discern from the ALJ's decision whether he concluded that the claimant was capable of medium-level work, or light-level work.

Turning to the ALJ's treatment of the opinions in the record, there was one functional assessment, which the ALJ rejected in part in favor of his reliance on objective medical testing, treatment records, notations of the claimant's mood and presentation, and detailed information relating to the claimant's attempts at work activities, her activities of daily living, and her social activities.   This functional assessment was from Dr. Roselli, who conducted a consultative examination of the claimant in connection with her application for benefits. (Tr. 531-36).  Upon examination, Dr. Roselli found "no palpable tenderness or spasms" in the claimant's spine, though

most of the time . . . ." Medium work is defined in 20 C.F.R. §§ 404.1567(c), 416.967(c) as work that "involves lifting no more than [fifty] pounds at a time with frequently lifting or carrying of objects weighing up to [twenty-five] pounds."

he noted that she could not "fully flex." (Tr. 531). Her gait was normal, and she was able to sit "without assistance and rise to a standing position without assistance." (Tr. 533). He opined that the claimant had greater limitations than those reflected in the ALJ's RFC determination in that, according to Dr, Roselli, the claimant could walk and stand for two hours in an eight-hour day, could sit for four hours in an eight-hour day, and would have difficulty crawling. (Tr. 536).[4] She did not require an assistive device, and her maximum lifting and carrying capacity was ten pounds frequently and twenty pounds occasionally. (*Id.*).

Portions of Dr. Roselli's assessment are consistent with a finding that the claimant was capable of performing light work. The defendant, however, contends that the ALJ properly "evaluated the medical and non-medical evidence in the record, and reasonably determined that [the] plaintiff could do a range of medium work." (Def.'s Mem. at 10). While, as discussed below, the ALJ properly evaluated the medical and non-medical evidence of the record, it is unclear whether he concluded that the claimant was capable of performing "light work" or "medium work," and therefore, whether the ALJ's physical RFC determination was supported by substantial evidence.

The ALJ thoroughly articulated his reasons for assigning little weight to Dr. Roselli's opinion, stating that the limitations identified by Dr. Roselli were "inconsistent with the imaging studies and clinical findings of her treating providers, the nature and frequency of treatment sought, her reported response to prescribed medications and her reported activities of daily living." (Tr. 20). The ALJ appropriately noted that the imaging studies of the claimant's lumbar spine

---

[4] Dr. Roselli's assessment regarding the claimant's lifting and carrying capacity aligns with the definition of light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), which involves "lifting no more than [twenty] pounds at a time with frequently lifting or carrying of objects weighing up to [ten] pounds." His sitting, standing and walking restrictions align with sedentary work, as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), which involves "sitting, [and] a certain amount of walking and standing[.]" Sedentary work also "involves lifting no more than [ten] pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *Id.*

initially, in June 2013, reflected "[m]ild degenerative disease [in the] lower lumbar spine without
significant interval change[]" (Tr. 618, 1121), then, in May 2013 were "[n]ormal[]" (Tr. 1124-25),
with early degeneration at L5-S1 and T11-T12 with some bulging of the disc (Tr. 617, 670, 1126),
and most recently, in July 2015, reflected "[n]o evidence of spinal canal stenosis, neuraloforaminal
narrowing or evidence of herniated nucleus pulposus[.]" (Tr. 504, 712, 1131).  Additionally, x-
rays of the claimant's cervical spine, taken in August 2014, showed altered curvature and mild
degenerative changes (Tr. 1128), and x-rays of her lumbar spine taken a month later showed no
acute fracture and no evidence of spondylolisthesis. (Tr. 1130).

Additionally, although the claimant repeatedly presented to the emergency room for
complaints of back pain, she consistently had normal range of motion upon examination.  (Tr. 423-
25, 427-28,  501, 556, 702, 726, 738-41), She reported improvement with medication (*see* Tr. 496,
499, 697, 700 (stating that Gabapentin "help[ed]" her back pain)), and although she was referred
for physical therapy and was assessed at her intake with chronic lower back pain, pain with
increased activity, decreased range of motion, decreased strength, and decreased functional
mobility (Tr. 1114), she failed to schedule physical therapy sessions and return for treatment. (Tr.
1118); *see* Social Security Ruling ["SSR"] 16-3p, 2017 WL 5180304, at *9 (S.S.A. Oct. 25, 2017)
("if the individual fails to follow prescribed treatment that might improve symptoms, we may find
the alleged intensity and persistence of the individual's symptoms are inconsistent with the overall
evidence of record").

 Records from Rockville Family Physicians on October 4, 2012 reveal that the claimant
exhibited drug seeking behavior, and her provider noted that, upon her exit, there was "no sign of
any back pain with brisk and determined steps and gait without any hesitation of limping."  (Tr.
367). Similarly, although she was referred for pain management for her back pain, on October 9,

2012, Dr. Mark Spencer from Woodland Anesthesiology declined to care for the claimant because, after reviewing her records, he did not "feel there [was] any procedure [he] could offer that [would] benefit" the claimant. (Tr. 378). Additionally, on September 15, 2017, the claimant was transferred from her doctor's office to the emergency room after exhibiting drug seeking behavior and making suicidal statements. (Tr. 621; *see* Tr. 571-76). Her doctor refused to give her Flexeril because of its sedating effects (Tr. 574, 621), and at the emergency room, she threw things around the room because she was upset that she was denied "certain med[ications]." (Tr. 578). The ALJ appropriately considered the plaintiff's course of treatment. (Tr. 19).

Moreover, the ALJ appropriately weighed the claimant's daily activities in formulating his RFC finding. (Tr. 14-15); *see Velazquez v. Berryhill*, No. 3:18 CV 1385 (SALM), 2019 WL 1915627, at *10 (D. Conn. Apr. 30, 2019) (holding that "the Regulations expressly provide that the RFC is determined 'based on all the relevant evidence in your case record'[, which] necessarily includes a claimant's reported activities of daily living") (citations and internal quotations omitted)); *see also Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 6 (2d Cir. 2017) (summary order). In this case, the ALJ appropriately considered the claimant's report to Dr. Vassilopoulos in March 2017 that she watched television, used the computer, cleaned, grocery shopped, cooked, performed household chores, and packaged and delivered newspapers daily. (Tr. 15; *see* Tr. 541). Additionally, the ALJ appropriately considered that she "attended cosmetology school early in the relevant period[,]" she "ke[pt] busy with helping her husband deliver newspapers and selling Avon products" and she sold candles. (Tr. 14).

The Second Circuit has upheld an ALJ's RFC determination where, even though "there was no competent medical opinion that supported" the ALJ's conclusions, "the record contain[ed] sufficient evidence from which [the] ALJ [could] assess the claimant's residual functional

capacity." *Monroe*, 676 F. App'x at 8 (alterations omitted).  In *Monroe*, the ALJ did not assign controlling weight to the assessment of the treating physician, but rather, relied on the treating physician's contemporaneous treatment notes detailing assessments of the claimant's "mood, energy, affect and other characteristics relevant to her ability to perform substantial gainful activity," and information "relating to [the claimant's] social activities relevant to her functional capacity-such as snowmobile trips, horseback riding, and going on multiple cruise vacations."  *Id.*

In this case, however, although the ALJ appropriately considered the plaintiff's "mood, affect and other characteristics relevant to her ability to perform substantial gainful activity" as well as information relating to her social activities, *see id.*, none of that evidence supports the ALJ's specific finding that the claimant was capable of ***medium*** capacity work, with the ability to frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds, and occasionally stoop, kneel, crouch and crawl.  (Tr. 15).  To compound this error, the ALJ stated in his decision that the claimant's "activities of daily living and treatment course support a finding that [she] [could] meet the demands of the range of ***light work*** set forth above."  (Tr. 19 (emphasis added)).

Additionally, the ALJ assigned more weight to the opinions of the State agency reviewers, Dr. Kaplan and Dr. Watkins, because he found them "well supported by explanation and relevant medical evidence." (Tr. 20). The State agency assessors who reviewed the claimant's medical records did not assess the claimant's functional limitations because they concluded, based on the record, that the claimant's alleged spinal impairment was nonsevere, and that the claimant's allegations were not supported by medical evidence.  Specifically, on December 15, 2016, Dr. Kaplan recited the claimant's treatment history and then opined that the claimant's primary allegation, degenerative disc disease, was not supported by the medical evidence a record, and her endometriosis, ovarian cyst, and hepatitis C were non-severe impairments. (Tr. 77; *see* Tr. 88-89).

Dr. Kaplan reached this opinion after reviewing the July 2015 MRI of the claimant's lumbar spine and the entries in the treatment records showing that the claimant had a normal gait and normal range of motion.  (Tr. 76).  Similarly, on February 27, 2017, Dr. Watkins offered the same opinion as Dr. Kaplan, noting there was no new medical evidence that supported a finding of worsening symptoms or greater functional impairment. (Tr. 102).

The ALJ did not err in concluding that these opinions were consistent with the claimant's record as a whole, including her daily activities.  The ALJ ultimately assessed the claimant with greater limitations in that he concluded that the claimant did have a severe physical impairment that limited her functioning, which was consistent with his RFC.  The ALJ, however, stated that their opinions, "[c]onsidered together with [the claimant's] sacroiliitis [and] her mild disc disease of the lumbar spine reasonable limit[ed] her to the range of *light* work set forth above."  (Tr. 20 (emphasis added)).

Thus, while in this case, the ALJ could rely on evidence in the record from which he could assess the claimant's RFC, *Monroe*, 676 F. App'x at 8, the ALJ's decision is internally inconsistent.  Based on the inconsistencies in his decision, the Court cannot discern how how the records upon which the ALJ relied "shed any light on [the claimant's] residual functional capacity" for medium work specifically. *Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017) (summary order). Accordingly, the Court cannot conclude that substantial evidence supports the ALJ's RFC determination that the claimant was capable of performing medium work with the limitations articulated by the ALJ.

Remand is required in this case solely for the purpose of allowing the ALJ to make additional findings regarding the claimant's physical residual functional capacity, and "not because there is persuasive proof" of the claimant's disability in the existing record. *Davis ex rel.*

*Maitland v. Colvin*, No. 6:11 CV 0658 (MAD/DEP), 2013 WL 1183000, at *12 (N.D.N.Y Feb. 27, 2013).  In his decision, the ALJ concluded that the claimant, who is now deceased, was capable of work at the medium exertional level, but he also concluded that the evidence of record, upon which he relied in formulating the claimant's RFC, supported a finding that the claimant was only capable of performing light exertional level work. The ALJ must review the evidence of record and issue a new decision detailing his RFC determination.  In this decision, the ALJ must weigh the one functional assessment in the record, and detail additional explanations of the evidence of record supporting his RFC finding.

B.      THE ALJ'S MENTAL RFC DETERMINATION WAS SUPPORTED BY THE MEDICAL OPINIONS IN THE RECORD

In his decision, the ALJ concluded that the claimant had the mental RFC to perform simple, routine repetitive tasks with no work with the public.  (Tr. 15).  The plaintiff contends that the ALJ offered "no explanation" for assigning "little weight to the two opinions of Dr. Vassilopoulos, which were consistent with the longitudinal record (Pl.'s Mem. at 11), the ALJ erred in assigning "great weight" to the opinion of Dr. Bangs, and the ALJ failed to incorporate Dr. Goodman's opinion relating to the claimant's ability to perform "simple, routine tasks" and would have trouble completed a normal workweek.  (*Id.* at 12-13 (citing Tr. 106)).

As discussed above, on November 8, 2016, Dr. Vassilopoulos performed his first consultative examination of the claimant in connection with her application for benefits.  (Tr. 517-21).  Because she dozed off "with literally every question[,]" Dr. Vassilopoulos could not determine her ability to perform commands or instructions. (Tr. 517).  He opined that her judgment was very poor, and her responsibility to perform employment was questionable. (Tr. 521).  He also noted that the claimant cared for her husband's children during the day, grocery shopped, independently "performed self-care skills[,]" and attempted to perform household chores.  (*Id.*).

31

On March 25, 2017, Dr. Vassilopoulos performed the second consultative examination. (Tr. 539-44). He found that her immediate and delayed memory were severely impaired, and her memory retrieval was mildly impaired. (Tr. 542). Her memory for contextual information was severely to moderately impaired and her memory for instruction was in the low average range (*Id.*). Her construction was moderately impaired, and she was not able to provide interpretation of two proverbs. (*Id.*). Her similarities and differences reasoning were in the severely impaired range, and her judgment was moderately impaired. (*Id.*). Her insight was poor. (Tr. 543). She reported that she watched television, used the computer, cleaned, grocery shopped, cooked, performed household chores, and packaged and delivered newspapers daily. (Tr. 541). Dr. Vassilopoulos concluded that the claimant could perform simple commands but had difficulty comprehending and performing instructions. (Tr. 544).

The ALJ explained that he assigned Dr. Vassilopoulos's opinions "little weight" because "[o]ver time," the claimant's treatment history and medication changes resulted in improvements in her cognitive functioning. (Tr. 20 (her medications "resulted in over[-]sedation which interfered with her cognitive functioning but improved once two of her medications were discontinued")). As the ALJ noted, the treatment notes at the time of Dr. Vassilopoulos's first examination reflected that the claimant was taking her methadone irregularly, which resulted in sedation. (Tr. 20). As the ALJ explained, this over-sedation resulted in a motor vehicle accident and multiple trips and falls that led to emergency room visits. (*Id.*). Specifically, in April 2017, the claimant swerved and crossed the yellow line causing a multiple vehicle accident when she was on her way home from the methadone clinic. (Tr. 1078-81; *see* Tr. 582-603). The claimant's longitudinal treatment record evidences her addiction to multiple prescription pain medications, many of which caused sedation, her failure to take her medications as prescribed (*see* Tr. 630 (failure to use methadone

consistently), 630 (stopped taking Latuda because she forgot), 679 (noting prescriptions for Seroquel from three providers)), and her use of marijuana which worsened her sedation. (Tr. 471, 591). A failure to follow prescribed treatment "without good reason" precludes a finding of disability. 20 C.F.R. §§ 404.1530(b), 416.930(b); SSR 16-3p, 2017 WL 5180304, at *9 ("if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of the individual's symptoms are inconsistent with the overall evidence of record"). The ALJ's consideration of a claimant's misuse of medication and failure to follow the advice of her providers was appropriate. *See Williams v. Berryhill*, No. 3:17 CV 1235(VLB), 2018 WL 4380983, at *12 (D. Conn. Sept. 14, 2018) (citing *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 250 (2d Cir. 2013) (noting that various courts have held that "[a] claimant's misuse of medications is a valid factor in an ALJ's credibility determinations").

As the ALJ noted, the claimant's cognitive functioning improved once two of her medications were discontinued. (Tr. 20). Specifically, her treating provider, PA Behrens, noted on August 25, 2017 that, although the claimant asked to resume taking Flexeril, she was more alert since Flexeril was discontinued. (Tr. 624). Additionally, there are multiple references to the claimant's anger, irritability, and inappropriate behavior, which the ALJ noted in his decision by concluding that the claimant had a "moderate limitation" in her ability to interact with others. (Tr. 14). There were also numerous records reflecting that the claimant was cooperative, friendly, social, and behaved normally. (Tr. 14; *see* Tr. 445, 471-72 ("cooperative behavior, clear & coherent speech, no thought abnormalities or perceptual distortions"), 492 ("cooperative with exam, cognitive function intact"), 643 (cooperative), 693 (same)). Moreover, the claimant attended cosmetology school at the beginning of her alleged period of disability, later sold Avon products and candles, which involved working with a mentor, and she had a "handful" of friends

she saw once or twice a month, which the ALJ appropriately considered in his RFC determination and his assessment of the claimant's ability to adapt or manage herself, and interact with others. (Tr. 14; *see* Tr. 445, 541). The ALJ appropriately noted that the claimant's activities of daily living supported his conclusion that the claimant could sustain the range of unskilled work detailed in his RFC determination, including restricting the claimant to work that did not require public contact. (Tr. 15).

In addition to considering Dr. Vassilopoulos's opinions, the ALJ stated that he accorded "great weight" to the opinions of the State agency reviewers, Dr. Bangs and Dr. Goodman.  (Tr. 20). "'State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such their opinions may constitute substantial evidence if they are consistent with the record as a whole.'" *Murillo v. Saul*, No. 3:19 CV 1307 (WIG), 2020 WL 1502194, at *7 (D. Conn. Mar. 30, 2020) (quoting *Babcock v. Barnhart*, 412 F. Supp. 2d 274, 280 (W.D.N.Y. 2006) (additional citations omitted)).  Moreover, an ALJ does not err in relying on such opinions, provided they are supported by evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

In this case, Dr. Bangs concluded that there was "insufficient evidence to substantiate the presence" of a mental disorder.  (Tr. 78). Dr. Bangs noted that the claimant was "independent" for her activities of daily living, and that Dr. Vassilopoulos's report had "questionable validity due to repeated dozing after nearly every question."  (*Id.*).  The ALJ, nonetheless, concluded that the claimant had some mental limitations which he accounted for in his mental RFC finding.

The ALJ's mental RFC finding was based largely on the assessment of Dr. Goodman, who reviewed the medical opinions of Dr. Vassilopoulos and Dr. Roselli before concluding that the claimant was moderately limited in her ability to understand, remember and carry out detailed

instructions; moderately limited in her ability to maintain attention and concentration for extended periods; moderately limited in her ability to interact appropriately with the general public; and, moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 105-06). Dr. Goodman also found that the claimant would have difficulty sustaining attention and focusing sufficiently to perform more complex tasks and, "given her mood lability[,] would occasionally have trouble completing a normal workweek." (Tr. 105-06). The ALJ incorporated into his RFC finding the limitations he found supported by the record. He concluded that the claimant was capable of performing simple, routine, repetitive tasks, which accounted for the limitations in the claimant's concentration and her limited ability to handle detailed instructions or perform complex tasks. (Tr. 15). Additionally, the ALJ limited the claimant to no work with the public, which accounted for the limitation in her ability to interact appropriately with the general public. (*Id.*). Unlike the ALJ's RFC determination regarding the claimant's physical limitations, the ALJ's mental RFC determination was consistent with his underlying assessment and with the medical record as a whole. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) (holding that "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole").

VI.   <u>CONCLUSION</u>

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 23) is GRANTED such that this matter is remanded for additional proceedings consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 25) is DENIED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 23rd day of June, 2020 at New Haven, Connecticut.

                                                  /s/Robert M. Spector, USMJ
                                                 Robert M. Spector
                                                 United States Magistrate Judge